**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| JOHN E. COX, EXECUTIVE DIRECTOR,  NEW HAVEN | : |
| COMMISSION ON EQUAL  OPPORTUNITIES, | : |
| | : |
| Plaintiff | : |
| v. | : |
| | : |
| EDWARD L. BLAND and | : |
| NEW HAVEN HOUSING AUTHORITY, | : Civil Number: |
| | : 3:00 CV 311 (CFD) |
| Defendant and Third Party Plaintiffs | : |
| v. | : |
| | : |
| BEACON/CORCORAN, JENNISON, LP, STAMFORD | : |
| WRECKING AND ANDREW CUOMO, SECRETARY FOR | : |
| THE FEDERAL AND UNITED STATES DEPARTMENT OF | : |
| HOUSING AND URBAN DEVELOPMENT (HUD), | : |
| | : |
| Third Party Defendants. | : |

**MEMORANDUM OF DECISION ON**
**BCJ'S RENEWED MOTION FOR SUMMARY JUDGMENT**
**ON THE CROSS-CLAIM OF**
**STAMFORD WRECKING COMPANY**

## I.   PROCEDURAL BACKGROUND

1.      This case, as originally filed by the parties, involved various claims

concerning the wage rates paid to laborers doing asbestos removal work at a federally funded

housing development of the New Haven Housing Authority ("Housing Authority"), the Elm

Haven Public Housing Development ("Elm Haven").  The Elm Haven project involved the

demolition of low-rise apartment buildings and the subsequent construction of privately

owned and operated mixed-income, two-story town homes.  Demolition and construction

activities were funded through a federal HOPE VI grant awarded by the United States

Department of Housing and Urban Development ("HUD") to the Housing Authority.

Pursuant to §12(a) of the United States Housing Act, as amended, 42 U.S.C. 1437j(a), the contracts, and demolition and construction activities at Elm Haven are subject to the Davis-Bacon Act prevailing wage requirements, 40 U.S.C. 276a, et seq.

2.    The original plaintiff in this case was John Cox, the Executive Director of the New Haven Commission on Equal Opportunities ("CEO").  The CEO (through Cox) brought this action in the Connecticut Superior Court in April, 1999 against the Housing Authority, alleging that the Housing Authority had failed to ensure that prevailing wage rates were paid to laborers performing asbestos removal work at Elm Haven in violation of various provisions of the City of New Haven's Code of Ordinances, Article I, Chapter 12 ½, and seeking, inter alia, an order requiring the Housing Authority to stop payment under its contract for the demolition work in question.

3.    In November, 1999, the Housing Authority filed a third party complaint against HUD, an entity related to Beacon/Corcoran, Jennison, LP ("BCJ") and Stamford Wrecking ("Stamford").  As more specifically discussed below, BCJ was the developer on the project.   Stamford was the subcontractor that performed the demolition work at Elm Haven, including the asbestos removal work, and employed the asbestos workers.  The Housing Authority's third party complaint alleged that, if the CEO's claims were correct, it was HUD, BCJ and/or Stamford, not the Housing Authority, which were responsible for ensuring that appropriate wage rates were paid at Elm Haven and therefore should be responsible for any resulting damages.

4.    In February, 2000, HUD removed the case to this court on the basis of 28 U.S.C. § 1442(a)(1) and, subsequently, Stamford filed its answer to the Housing Authority's third party complaint as well as counterclaims against the Housing Authority and cross

claims against BCJ and HUD.  Stamford's claim against BCJ in Count I of its Cross Claim is

that BCJ failed fully to reimburse Stamford for payments Stamford made to asbestos workers

at Elm Haven under wage rate decisions issued by the U.S. Department of Labor ("DOL")

for asbestos workers in May, 1999 and March, 2001, in violation of certain federal

regulations.  In Count II (Intentional Misrepresentation) and Count III (Negligent

Misrepresentation) of Stamford's Cross Claim against BCJ, Stamford alleged that BCJ

misrepresented to Stamford that a wage rate schedule and classification correction would be

requested from HUD and DOL and that, if approved, Stamford would be reimbursed

retroactively for such increased wage rates.

5.     Dispositive motions were then filed by various parties, including BCJ's

Motion for Summary Judgment on all of Stamford's cross claims, which were denied

without prejudice to renewal.  After a period of mediation, the parties jointly informed the

Court that they were in agreement to dismiss all pending claims in the lawsuit except for

Stamford's state law claims against BCJ (Stamford Cross Claim, Counts II and III) for

intentional misrepresentation and negligent misrepresentation.  As a result, BCJ filed a

Renewed Motion for Summary Judgment on those claims, which is addressed in the opinion.

## II.   FINDINGS OF FACT AND CONCLUSIONS OF LAW

6.     HUD funded the redevelopment, inter alia, of Elm Haven through a HOPE VI

Grant Agreement.  In 1997, the Housing Authority selected BCJ, a Massachusetts limited

liability corporation,  in which two entities, Beacon Residential Properties Limited

Partnership and Corcoran Jennison Company, Inc., were the member managers, to assist the

Housing Authority with its development plan for Elm Haven.  In December, 1997, the

Housing Authority entered into the "Elm Haven Redevelopment Agreement"

3

("Redevelopment Agreement") with Elm Haven Homes Partnership ("EHHP"), a
Connecticut general partnership having as its general partners Beacon Residential Properties
Limited Partnership and Corcoran Jennison Company, Inc. (the member managers of BCJ
Partners) in order to continue the redevelopment of Elm Haven.

7.     Under the Redevelopment Agreement, EHHP was to redevelop the Elm
Haven project pursuant to an agreed upon Guaranteed Maximum Price, Redevelopment
Budget and Schedule and through a construction contract with the named  "Construction
Manager,"  Elm Haven Construction Limited Partnership ("EHC").  In February, 1998,
EHHP and EHC entered into a Construction Management Agreement for the demolition
work at Elm Haven in Phases defined there as Phases A through F.  Pursuant to each of these
contracts, the work at Elm Haven was subject to the provisions of the Davis-Bacon Act.

8.     Meanwhile, in October, 1997, BCJ had initiated on behalf of the Housing
Authority the process of obtaining prevailing wage rates from HUD for the demolition work
at Elm Haven by submitting to HUD a DOL Form 308, a Request for Determination and
Response to Request under the Davis-Bacon Act. On that Form SF-308, BCJ requested a rate
for asbestos workers.  In response, in December, 1997, HUD forwarded to BCJ DOL's
Federal Wage Decision Number CT97-2 for use in the demolition work at Elm Haven.  That
wage decision applied the Residential wage rate classification to the Elm Haven project, and
contained no classification for asbestos workers.  Instead, the wage decision contained a
classification for unskilled laborers at a rate of $5.33 per hour with no fringe benefits.

9.     These minimum required Residential wage rates were included in the Elm
Haven Project Manual, which was the document provided by EHC to potential bidders, and
which bidders then use to formulate their bids.  In December, 1997, Stamford submitted the

4

winning bid for the Elm Haven demolition work, in which it acknowledged that it had received the Project Manual addendum including the Residential wage rates discussed above. In March, 1998, Stamford and ECH entered into a Subcontract Agreement for that work.

10.     Both Stamford's bid document and the Subcontract Agreement provided a total price for which Stamford would complete the required work of each phase of the project.  In addition, the Agreement, inter alia, required that Stamford comply with the Davis-Bacon Act, hire and train a required number of Elm Haven (public housing) residents (the so-called "Section 3" workers), and bring any claims arising out of the Agreement within 6 months of the sooner of the date the claim arises or the Agreement is terminated.

11.     Stamford then commenced performance of the Elm Haven demolition work through three wholly owned subsidiaries, AeroClean Demolition Contractors, Inc. ("Aero"), Standard Abatement Services, Inc. ("Standard Abatement") and Standard Removal Contractors, Inc. ("Standard Removal").  Aero and Standard Removal were subsidiaries through which Stamford employed its own asbestos removal workers.  Standard Abatement was the subsidiary through which Stamford employed the required project residents, the so-called "Section 3."

12.     From the commencement of the performance of the contract in 1998, Stamford paid virtually all of its own employee asbestos workers at Aero and Standard Removal at a rate equal to or in excess of $15.00 per hour.  In contrast, Stamford paid the asbestos removal workers who were Elm Haven residents, the "Section 3" workers,  $7.00 per hour.  Indeed, Stamford paid the resident workers at the rate of $7 per hour (rather than the minimum rate of $5.33 per hour for unskilled laborers) only because EHHP, EHC and the Housing Authority agreed to and did reimburse Stamford for the increase for resident

5

workers.  Stamford continued to pay its own employee asbestos workers the rate of $15 or more throughout its performance of the contract.

13.     Ultimately, Stamford, the Housing Authority and HUD jointly participated in requesting an additional wage classification for asbestos workers and proposed a wage rate of $15 per hour from DOL in April, 1999.  DOL issued an additional wage rate classification for Elm Haven, dated May 6, 1999, in which it approved a classification for Asbestos Removal Workers at $15 per hour under Wage Decision No. CT970002.  That DOL decision by its terms required that all asbestos workers be retroactively reimbursed, if necessary, for work at the $15 per hour rate from the first day they performed work in that classification.

14.     Stamford was made aware of the issuance of the wage rate of $15 per hour, as it had requested, shortly after the issuance of the wage decision in 1999.  After DOL's action, EHHP and the Housing Authority agreed to reimburse Stamford for the differential Stamford was required to pay to project resident Section 3 workers to bring them to a rate of $15 per hour, and ECH did so by a change order executed in 1999.

15.     During 1999, Stamford completed its work on Phases A through C of the demolition contemplated in the Subcontract Agreement, which had always been contemplated as the first part of the work on the project.  For various reasons, no further work was undertaken on the demolition for what was contemplated as the second part of the project (specifically on Phases E & F) until the recommencement of Phases E & F in 2000.  At that time, in June, 2000, EHHP issued a Construction Change Directive which cancelled the original Phases E & F and substituted new Phases A, B and C for the completion of the demolition/abatement work to be performed on the remaining 15 buildings that had constituted the original Phases E and F of the Project.  Included with that Construction

6

Change Directive were new written specifications for the work to be performed, as well as

General Wage Decision CT000002, dated February 11, 2000, as approved by HUD, which

provided wage rates for asbestos workers of $17.40 per hour plus $4.70 per hour in fringe

benefits.

16.    Because further delays had occurred, EHHP submitted a new Form SF-309

for Elm Haven wage rates in March, 2001 in order to confirm that the correct wage rates

were being used.  That request specifically stated that the new rates were sought, with respect

to demolition, only for the 15 existing buildings which constituted demolition Phases E and

F.  HUD approved the request and forwarded to EHHP the applicable wage rates set forth in

its most recent General Wage Decision, No. CT010002, which had the same minimum

required wage rate for asbestos workers as Decision No. CT000002.

17.    EHC duly issued a change order to Stamford on May 1, 2001 to incorporate

the increases for Phases E and F.  The Change Order, which Stamford signed and

acknowledged, specifically stated that it was being issued only for Phases E and F to

incorporate, inter alia, General Wage Decision No. CT000002.

## A.    **Summary Judgment Standard**

18.    A motion for summary judgment must be granted if the Court determines that

there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law.  Knight v. U.S. Fire Insurance Company, 804 F.2d 9, 11 (2d

Cir. 1986); Beck v. Alliance Funding Company, 113 F. Supp. 274, 275 (D. Conn. 2000).  It

is the substantive law governing the case that defines and identifies the facts that are material

on a motion for summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249

(1986); Beck, supra.

> Once the moving party has made a showing that there are no genuine
> issues of fact to be tried, then the burden shifts to the non-moving party to
> raise triable issues of fact.  Id [Anderson], at 256, ….  Mere conclusory
> allegations will not suffice.  Instead, the non-moving party must present
> "sufficient probative evidence" to show that there is a factual dispute.
> Fed. R. Civ. P. 56(e).

Beck, supra.

19.    Nor may a party opposing summary judgment rely on bare allegations, the

facts of which lie within their control and can only be obtained by the moving party through

discovery.  Knight, 804 F.2d at 12; Eastway Construction Corporation v. City of New York,

762 F.2d 243, 251 (2d Cir. 1985).  Indeed, the existence of factual disputes between the

parties, where those issues are not material to the claims before the Court, will not defeat

summary judgment.  Rather, the Court considering summary judgment must determine

which unresolved issues are not material under the applicable law that defines the issues.

Knight, 804 F.2d at 11-12; Quarles v. General Motors Corporation, 758 F.2d 829, 840 (2d

Cir. 1985).

20.    Summary judgment "permits a court to streamline the process for terminating

frivolous claims and to concentrate its resources on meritorious litigation.  Quinn v. Syracuse

Model Neighborhood Corporation, 613 F.2d 438, 445 (2d Cir. 1980).  Knight, 804 F.2d at

12.  It should be regarded by the Court "not as a disfavored procedural shortcut, but rather as

an integral part of the Federal Rules as a whole, which are designed 'to secure the just,

speedy and inexpensive determination of every action.'  Fed. Rule Civ. Proc. 1…."  Celotex

Corporation v. Catrett, 477 U. S. 317, 106 S. Ct. 2548, 2555 (1986).

21.    Stamford conceded in oral argument that it required no discovery in order to

respond fully to BCJ's motion for summary judgment.

**B.    BCJ is entitled to summary judgment on Stamford's misrepresentation claims because Stamford has failed to demonstrate the required elements of such a claim.**

22.    The elements of intentional misrepresentation are:  "(1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did act upon that false representation to his injury."  <u>Suffield Associates Limited Partnership v. National Loan Investors, L.P.</u>, 64 Conn. App. 202 (2001).  Negligent misrepresentation is actionable if the other elements of misrepresentation are present and the "declarant has the means of knowing, ought to know, or has the duty of knowing the truth."  [citation omitted; internal quotation marks omitted]  <u>D'Ulisse-Cupo v. Board of Directors of Notre Dame High School</u>, 202 Conn. 206, 520 A.2d 217, 223 (1987).

23.    In response to BCJ's motion for summary judgment, Stamford has asserted, in a statement of "material disputed facts," that with respect to a prior contract on an earlier phase of the Elm Haven project, HUD had changed the entire wage rate classification from the lower Residential classification to the higher Heavy-Highway classification, and that Stamford had been retroactively reimbursed as a result of that wage classification change. Stamford further states, as a matter of claimed disputed fact, that, in bidding on the contract at issue in the instant case for which HUD and DOL had set rates based on the Residential wage rate classification, Stamford lowered its bid to reflect the lower permitted wage rates. Stamford claims to have done so "based on the understanding with BCJ that when the proper wage rates were obtained [Stamford] would be reimbursed retroactively for the difference in wages as it had been for Phase I."  Stamford states that the "understanding" is "[b]ased on the prior course of dealing on Phase I...".

24.     Stamford's claims fail to fulfill the required misrepresentation elements for several reasons.  First, Stamford has failed to identify any actionable misrepresentation on the part of BCJ.  Rather, it has only presented its "understanding," based on BCJ's prior conduct on a different contract, that BCJ would reimburse it retroactively if any wage rate increases were obtained.  Since this case gave rise to no duty on the part of BCJ to disclose any facts to Stamford, to avoid summary judgment Stamford was required to adduce facts showing that BCJ made affirmative misrepresentations that misled Stamford.  See Olson v. Accessory Controls and Equipment Corporation, 254 Conn. 145, 757 A.2d 14, 34 (2000); Duksa v. Middletown, 173 Conn. 124, 127, 376 A.2d 1099 (1977).  It has not done so.  Moreover, even if its reference to an "understanding" suggests an affirmative representation allegedly made by BCJ, it has failed to raise a genuine issue of material fact.

25.     Stamford also specifically argues that the "misrepresentation" of which it complains is that "when the proper wage rates were obtained…" i.e. the Heavy-Highway wage rate classification, Stamford "would be reimbursed retroactively for the difference in wages as it had been for Phase I."  It is undisputed that the Heavy-Highway wage classification was never granted by HUD or DOL.  Thus, this alleged misrepresentation by Stamford bears no relationship to the BCJ conduct which is the subject of Stamford's claim – BCJ's failure to retroactively reimburse Stamford when HUD and DOL set one wage rate within the existing Residential wage classification applicable to the contract at issue here.

26.     Finally, Stamford's claim fails to fulfill the required elements of misrepresentation because Stamford has not shown that it relied to its detriment on the "misrepresentation" alleged – that BCJ would reimburse it retroactively if Heavy-Highway wage rates were set.  Stamford asserts as a matter of disputed fact that it reduced its bid  to

10

"reflect the lower scale."  However, it is undisputed here that Stamford then commenced to pay its own asbestos workers at the rate of $15 per hour, the rate ultimately set by HUD and DOL as the wage rate for asbestos workers under the lower Residential wage category applicable under the contract at issue.  Thus, even if Stamford could prove at trial that it lowered its bid to reflect the lower Residential wage rates, this caused Stamford no detriment, since it ultimately only paid its own workers at the Residential rate.

C.      **BCJ is entitled to summary judgment on Stamford's misrepresentation claim because the alleged oral agreement for retroactive compensation Stamford claims to have relied on was unenforceable and illegal**

27.      BCJ is also entitled to summary judgment on Stamford's misrepresentation claims because, even if Stamford could prove at trial the disputed assertion that BCJ "misrepresented" that Stamford would be retroactively reimbursed upon the issuance of a higher wage rate, the claim is not actionable in fraud because such an agreement between BCJ and Stamford would have been both unenforceable and illegal.

28.      It is undisputed that Stamford chose to compensate its own employees from the beginning of the contract at a rate of $15 per hour, which was the rate it bid for its own workers even under the original Residential wage classification imposed by HUD and DOL, and that it did so well prior to the issuance by DOL of a specific $15 wage rate for asbestos workers in the May, 1999 wage decision. Therefore, under the original set contract price, Stamford was already being compensated under the existing contract for the $15 per hour it had bid and chosen to pay its own workers.  Consequently, the disputed "understanding" that Stamford claims existed would essentially have been an oral agreement by BCJ to alter and increase the contract price of the executed Subcontract Agreement, should a new wage rate be issued, in order to provide additional payment to Stamford for the same worker costs

11

Stamford had bid and paid its own workers as part of the original contract, and for which Stamford was already being compensated under the original contract.

29.     Such an oral agreement to increase the contract price for worker costs that had not changed is not enforceable.  The Subcontract Agreement prohibits changes to the contract price without a written amendment.   In addition, the HUD regulations applicable to the terms of all contracts connected with the Elm Haven project, 24 C.F.R. Part 85, specifically bar an oral agreement of the type Stamford relies on.  The regulations require that, for construction projects such as Elm Haven, parties "shall obtain prior written approval for any budget revision which would result in the need for additional funds."  24 C.F.R.85.30(c)(2).

30.     Oral agreements to change contract provisions which conflict with applicable regulations (and superceding contract terms) requiring written contract modifications are unenforceable.  Prestex, Inc. v. United States, 3 Cl. Ct. 373, 377-379 and n. 5 (Cl. Ct. 1983), aff'd 746 F.2d 1489 (1984).   Stamford was charged with knowledge that such oral agreements would be unenforceable.  Federal Crop Insurance Corporation v. Merrill, 332 U.S. 380, 384-385 (1947); Larmann v. State Farm Insurance Company, 2005 WL 35719 *2 (E.D. La. 2005); Hermes Consolidated, Inc. v. United States, 58 Fed. Cl. 409, 416 (Ct. Fed. Cl. 2003); M&L Homes, Inc. v. Zoning and Planning Commission of the Town of Montville, 445 A.2d 591, 597 (Sup. Ct. Conn. 1982).  In addition, in government funded contracts, contractors bear the risk that the person with whom they are dealing has the authority to make binding agreements "before they place reliance thereon.  See Federal Crop Ins. Corp. v. Merrill, supra [332 U.S. 380, 384 (1947)]."  Prestex, Inc., 3 Cl. Ct. at 379.

31.     The agreement on which Stamford claims it relied is also unenforceable because, if made by BCJ, such an agreement would have been anti-competitive and therefore

illegal.  In this situation, the retroactive compensation of Stamford for the wages it paid its own non-resident asbestos workers from the beginning of the contract was not permitted or required under Davis-Bacon Act regulations.  29 C.F.R. 1.6, the regulation upon which Stamford relies for such retroactive compensation, permits DOL to issue a wage determination after contract award or the commencement of construction if the government has previously failed to incorporate an appropriate wage rate or incorporated one which by its terms is not applicable to the contract.  When that occurs, the agency may either terminate and resolicit the contract with the valid wage rate or incorporate the valid wage rate retroactive to the beginning of construction through supplemental agreement or change order, "provided that the contractor is compensated for any increases in wages resulting from such change."

32.     Here, the wages paid by Stamford to its own employees from the start of work did not increase at all, and did not increase as a result of the issuance of the May, 1999 wage rate for asbestos workers.  Rather, Stamford paid $15 per hour or more to its own employees from the start of work without regard to what the applicable wage rates did or did not require, and was able to incorporate that amount into its bid and the original contract price prior to the issuance of the wage determination.  In such a situation, an increase or change in the Davis-Bacon wage rate does not entitle a contractor to an increase in the contract price since the wage rate increase did not itself increase the cost of contract performance.  Opinion of the Comptroller General to the Secretary of the Interior, 37 Comp. Gen. 326, 327 (1957).  See Appeal of Morrison-Knudsen Company, Inc. & Associates, 65-2 BCA P 4891 (1965 WL 375) (Armed Services Board of Contract Appeals 1965).

33.     Moreover, the Davis-Bacon Act gives no rights to government contract bidders in this situation.  The DOL's wage rate decisions are final and a contractor's reliance on even

incorrect wage rates which are later changed is not actionable by the contractor.  United States v. Binghamton Construction Company, Inc., 347 U.S. 171 (1954).  See also Morrison-Hardeman-Perini-Leavell v. United States, 392 F.2d 988, 995-997 (Ct. Cl. 1968).

34.    Therefore, even had BCJ promised such retroactive compensation, it would have promised Stamford a contract benefit (and contract price increase) not authorized by law and which had not been equally made available to other bidders in formulating their contract prices.  Such conduct would have been in violation of the provision of EHHP's contract with the Housing Authority requiring the developer to conduct its own procurement procedures in selecting contractors so as to provide "open and free competition," and to avoid "noncompetitive practices among contractors that may restrict or eliminate unfair competitive advantage."

35.    Moreover, in order to provide such a contract price increase to Stamford, EHHP would have in turn had to seek an equivalent price increase from the Housing Authority.  To agree with Stamford in advance that such an unauthorized price increase would be provided would have in turn violated the procurement standards in 24 C.F.R.Part 85 under which the Housing Authority selected EHHP.  24 C.F.R. 85.36 (c) prohibits "[n]oncompetitive pricing practices between firms or between affiliated companies."

36.    Such an agreement to do an improper or illegal act would have been unenforceable.  Kiely v. Raytheon Company, 105 F.3d 734, 736-737 (lst Cir. 1997); Couldock & Bohan, Inc. v. Societe Generale Securities Corporation, 93 F. Supp. 2d 220, 227-228 (D. Conn. 2000); Rice v. Farrell, 28 A. 2d 7, 366-368 (Sup. Ct. Conn. 1942); Central Delivery Service of Washington, Inc. v. People's Bank, 1992 WL 79815, *2 (Conn. Super. 1992).

14

37.    Because the representations upon which Stamford relies constitute unenforceable promises, they are likewise not actionable in tort as misrepresentations.  Silver v. Jacobs, 682 A.2d 551, 557 (App. Ct. Conn. 1996), cert. denied 684 A.2d 708 (1996), reversed in part on other grounds, Gagne v. Vaccaro, 766 A.2d 416 (Sup. Ct. Conn. 2001); Hartman v. Harris, 810 F. Supp. 82, 86 (S.D.N.Y. 1992); aff'd 996 F.2d 301 (2d Cir. 1993). See also American Viking Contractors, Inc. v. Scribner Equipment Company, Inc., 745 F.2d 1365, 1372 (11th Cir. 1984).  A party cannot reasonably rely on a promise which is unenforceable or illegal, and reliance cannot be said to be detrimental where a party was not entitled to the action promised in any event.  Id.  See also Kiely, supra.

38.    Moreover, parties dealing with government contractors are barred from raising misrepresentation claims based on alleged representations that are contrary to law, of which such parties are deemed to have constructive knowledge.  Reliance on any such representations that conflict with applicable law is "unreasonable as a matter of law".  Larmann, 2005 WL 35791, at *4, quoting Richmond Printing, LLC v. Director, FEMA, 72 Fed. Appx. 92, at 98, 2003 WL 21697457 (5th Cir. 2003), and Merrill, 332 U. S. at 385.

**D.    Stamford's misrepresentation claims, like its other claims, involve an interpretation of Davis-Bacon regulations and therefore should have been brought in the first instance before the U.S. Department of Labor**

Stamford has conceded in its summary judgment papers, as it must, that the U.S. Department of Labor ("DOL") must hear most matters related to the Davis-Bacon Wage rates in the first instance.  As required by DOL Regulation (29 C.F.R. 5.5(a)), the Subcontract Agreement between Stamford and EHC requires that Stamford comply with DOL regulations contained in 29 C.F.R. Part 5.  Part 5  governs, inter alia, Davis-Bacon procedures and requirements in contracts covering federally financed or assisted construction.  29 C.F.R.

5.5(a)(9) requires that any disputes under contracts covered by Part 5 and arising out of labor standards be resolved in accordance with the procedures of DOL set forth in 29 C.F.R. parts 5, 6 and 7.  Those provisions set forth a dispute resolution process which requires disputes be first brought to DOL for investigation, decision, ruling or interpretation (29 C.F.R. 5.11 and 5.13), then to a DOL Administrative Law Judge for review (29 C.F.R. Part 6) and finally on a petition for review to the DOL Administrative Review  Board (29 C.F.R. Part 7).  29 C.F.R. 5.13 has particular applicability to the claims of Stamford here.  It requires that [a]ll questions relating to the application and interpretation of wage determinations … issued pursuant to Part 1 of this subtitle, of the rules contained in this part and in Parts 1 and 3 of the labor standards provisions of any of the statutes listed in §5.1 shall be referred to the Administrator for appropriate ruling or interpretation.

40.    Thus, claims concerning the meaning of a wage decision or the proper interpretation of 29 C.F.R. 1.6 may not be brought in federal court under the circumstances here.  The existence of the extensive administrative review scheme set forth in 29 C.F.R. parts 5, 6 and 7, as well as DOL's expertise in Davis-Bacon matters, compels those with such claims to proceed administratively.   <u>Bradbury</u>, 138 F. Supp. .2d 243-244; <u>see also</u>  <u>United States ex rel. Windsor v. DynCorp, Inc.</u>, 895 F. Supp.. 844, 851-852 (E. D. Va. 1995). Indeed, the procedures set forth in 29 C.F.R. Part 5 clearly indicate that all "disputes evolving from the Davis-Bacon Act will be resolved through the Department of Labor's procedures and not in federal court." <u>Bradbury</u>, 138 F. Supp. 2d at 244.

41.    Because of the nature of Stamford's misrepresentation claims, they, like Stamford's other claims now conceded (in the first count), are subject in the first instance to the administrative review process before DOL.  Stamford stated in its summary judgment

16

papers that its misrepresentation claim "boils down to" a single disputed assertion that BCJ allegedly "recognized" that the wrong wage rate had been issued (i.e., Residential rather than Heavy/Highway) and that, if corrected, BCJ would retroactively increase Stamford's contract price. Thus, even if this claim could be proven factually at trial, Stamford's misrepresentation claim depends completely on the preliminary question of whether the correct wage classification was applied and, if so, what effect that would have on Stamford's contract price.

42.     Since "all questions relating to the application and interpretation of wage determinations" [emphasis added] must be determined by DOL (29 C.F.R. 5.13), Stamford is barred in bringing even its misrepresentation claims without having first brought to DOL the resolution of the wage rate questions that are the basis of those claims. Since it has not done so, this Court is without authority to resolve the claims in the first instance.

**E.     Stamford's misrepresentation claims concerning the May, 1999 Wage Determination are barred by the contractually imposed statue of limitations.**

43.     The Subcontract Agreement requires that any action against either the Housing Authority or the developer entity "upon any claim based upon this Agreement or arising out of anything done in connection with this Agreement" must be "commenced within six months after the sooner [of] (I) termination of this Agreement, or (ii) the date the claim arises." Stamford's cross claim against BCJ was filed July 6, 2001. Based on this provision, all of Stamford's claims that are related to BCJ's actions with respect to the May, 1999 wage determination are barred. This includes Stamford's misrepresentation claims since they are based on alleged misrepresentations made regarding how Stamford would be compensated under the Agreement if wage rates were issued.

44.    Stamford's cross claim asserts that it had no direct knowledge of the substance of the May 6, 1999 determination until "on or about June 26, 2001." [Stamford Cross Claim, ¶ 32]. By this, Stamford apparently means that Stamford was unaware that the wage decision itself contained language requiring retroactive compensation of asbestos workers to a rate of $15 per hour, if necessary. However, in its summary judgment response, Stamford specifically admitted that the wage decision was issued on May 9, 1999, and that:

> [s]hortly after DOL's approval of a minimum wage rate of $15 per hour for asbestos workers at Elm Haven, Stamford was made aware that the wage rate in the amount of $15, as requested by Stamford, had been issued by DOL.

45.    Stamford's cross claim is not based on the retroactivity language of the wage decision itself, which clearly requires only that workers be retroactively compensated. Rather, Stamford claims a right to compensation based on an existing federal regulation, 29 C.F.R. 1.6, governing when contractors should be compensated retroactively after wage rates are changed. Once the May, 1999 wage decision was issued, Stamford was chargeable with knowledge of its alleged right to that compensation under the regulation as soon as it became aware in 1999 that the wage rate of $15 per hour had been issued.

46.    Parties are charged with knowledge of the law as it exists, including knowledge of applicable regulations. Federal Crop Insurance Corporation v. Merrill, 332 U.S. 380, 384-385 (1947); Larmann v. State Farm Insurance Company, 2005 WL 35719 *2 (E.D. La. 2005); Hermes Consolidated, Inc. v. United States, 58 Fed. Cl. 409, 416 (Ct. Fed. Cl. 2003); M&L Homes, Inc. v. Zoning and Planning Commission of the Town of Montville, 445 A.2d 591, 597 (Sup. Ct. Conn. 1982). In contract interpretation, parties are deemed to have constructive knowledge of the effect of applicable federal regulations even if they actually had no actual knowledge of the regulations, and the regulations are not referenced in

the contract.  The Hunt Construction Group, Inc. v. United States, 281 F.3d 1369 (Fed.Cir. 2002).  For this reason, a party's lack of knowledge of an applicable regulation does not excuse its failure to take a required timely action.  M&L Homes, Inc., supra.  Moreover, the statute of limitations for an action, such as Stamford's, based on a right claimed under applicable regulations begins running whether or not the party has actual knowledge of the rights imposed or granted by regulation.  Haberbush v. Christensen, 479 N.Y.S.2d 847, 850 (Sup. Ct., App. Div., 3rd Depart. 1984), app. Denied 486 NYS 2d 1025 (1985).

47.    Since Stamford failed to act on its claim for misrepresentation concerning its right to retroactive compensation under the contract for approximately two years after the right accrued, its claims in this respect are untimely under the contractually imposed 6 month limitations period.

**F.    BCJ is entitled to summary judgment on Stamford's claims with respect to the March, 2001 wage rates, to the extent its misrepresentation claims apply to those rates.**

48.    Stamford has agreed to dismiss its claims for retroactive compensation under the March, 2001 wage decision that are based on its federal claims in Count I of its Cross Claim.  It is unclear whether it intends to assert that its misrepresentation claims apply to BCJ's failure to apply retroactively the rates set forth in that March 2001 decision.  To the extent that Stamford makes this claim, BCJ is entitled to summary judgment in this regard for the same reasons described above, except for the application of the contractual statute of limitations.

49.    In addition, the undisputed facts show that the March, 2001 wage rates were issued on a prospective basis only, and only with respect to demolition Phases E and F. Therefore, Stamford was not required to compensate asbestos workers at the increased rates

for any work prior to those phases, and has already been duly compensated by change order for the increased rates going forward.  In this situation, neither the wage decision nor 29 C.F.R. 1.6(f) would require or permit Stamford's retroactive compensation.  See Kirchhof v. United States, 102 F. Supp. 770 (Ct. Cl. 1952).

50.    Moreover, with respect to the March, 2001 wage decision, it is undisputed that Stamford was fully aware and was expressly in agreement that the new wage rates were prospective in nature only.  Indeed, the entire process of permitting Stamford to rebid Phases E and F at a higher price was one which inured completely to the benefit of Stamford.  Thus, Stamford has not attempted to, and could not credibly, assert that it was in any way misled by BCJ into believing that the March, 2001 rates would be applied retroactively.  In making such a claim, what Stamford would in essence be saying is that it should be compensated now, at rates contained in wage decisions issued in 2000 and 2001, for work performed by workers in 1998 and 1999 under different wage rates then in effect.  If Stamford intended to make such a claim, it is without merit.

## CONCLUSION

51.    As a result of the foregoing, BCJ's renewed motion for summary judgment with respect to Counts II and III of Stamford's Cross Claim [doc. no. 156] is hereby GRANTED.

**SO ORDERED**  this 27th day of October, 2006 at Hartford, Connecticut.


   /s/ CFD
CHRISTOPHER F. DRONEY
UNITED STATES DISTRICT JUDGE